# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

| | | |
|---|---|---|
| TIMOTHY FITZGERALD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:10CV02448 AGF |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

This action is before this Court for judicial review of the final decision of the Commissioner of Social Security finding that Plaintiff Timothy Fitzgerald was not disabled and, thus, not entitled to disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-434, or Supplemental Security Income under Title XVI of the Act, *id.* §§ 1381-1383f.  For the reasons set forth below, the decision of the Commissioner shall be reversed and remanded.

Plaintiff, who was born on August 8, 1969, filed for benefits in December 2007, alleging a disability onset date of December 19, 2006, at age 37, due to bipolar disorder, seizures, closed head injuries in the past, and high blood pressure.  A previous application for disability insurance benefits was denied at the initial administrative level on April 23, 2007, and Plaintiff did not pursue the matter further.  After Plaintiff's December 2007 applications were denied at the initial administrative level, he requested a hearing before an Administrative Law Judge ("ALJ") and such a hearing was held on August 19, 2009,

at which Petitioner and a vocational expert ("VE") testified. By decision dated September 22, 2009, the ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform jobs identified by the VE, and was, therefore, not disabled under the Act.

Plaintiff's request for review by the Appeals Council of the Social Security Administration was denied on 2009. Plaintiff has thus exhausted all administrative remedies and the ALJ's September 22, 2009 decision stands as the final agency action now under review. Plaintiff argues that the ALJ's RFC assessment is not supported by any medical evidence. Rather, Plaintiff argues, the medical record shows more substantial mental limitations than those recognized by the ALJ. Plaintiff also argues that the ALJ improperly concluded that if Plaintiff were compliant with treatment, he would be able to work; and failed to consider Plaintiff's IQ scores and physical limitations.

## BACKGROUND

### Work History and Application Form

Plaintiff had minimal annual earnings from 1985 through 2005, earning over $9,000 only in 2001 (approximately $15,000) and 2003 (approximately $10,000). During these years he worked as a dishwasher/prep cook. In 2005 he had no earnings. In 2006 he worked as a car detailer, earning approximately $20,000, and in 2007 he earned approximately $600. (Tr. 117, 156.)

On his application forms, Plaintiff wrote that he could not work due to periodic seizures ("sometimes once a month, sometimes more sometimes less") and bipolar

disorder.  He also wrote that he did not like to go out of the house and did not associate well with others.  He believed that the Trazadone (used to treat depression and anxiety disorders) he was taking was the cause of his feelings of dizziness and sleepiness.  On an average day he would drink coffee, clean the house, watch TV, and walk around the block.  He reported that he did not have the concentration to read, did not drive due to his seizure problems, and had difficulty understanding verbal and written instructions.  (Tr. 148-54.)

**Medical Record**

On February 24, 2006, Plaintiff visited the emergency room due to a panic attack. His current medications were noted as including Prozac, Trazadone, and Risperdal (used to treat seizures and bipolar disorders).  Physical and mental examinations were normal, except for anxious mood.  Plaintiff was given Ativan and released that day in improved condition.  (Tr. 210-12).

Approximately one year later, on March 6, 2007, Plaintiff presented to a health center and reported a history of seizures and depression.  (Tr. 214-17).  He was referred for a psychological evaluation to licensed psychologist Joseph Monolo, who examined Plaintiff the next day.  Plaintiff had been homeless the previous month and a half and had just moved into his father's basement.  He reported a history of seizures with a mild seizure last occurring in January 2007.  School records indicated special education diagnoses of learning disabled and behavior disordered.

Plaintiff told Mr. Monolo that he currently consumed a six-pack of beer three to

four times weekly and smoked marijuana once or twice a month. Plaintiff noted that a

physician recently prescribed psychotropic medications that were helpful, but Plaintiff

stopped taking them about a month prior to the evaluation because he could not afford

refills. On an average day, Plaintiff would hang out at a friend's house, watch television,

go to a bar with two to three friends where he did odd jobs in exchange for beer or soda,

and would sometimes perform household tasks. Mr. Monolo noted a largely normal

mental-status examination. Plaintiff reported daily auditory and visual disturbances, but

Mr. Monolo noted that a lack of medication for the past month might account for

Plaintiff's symptoms and that Plaintiff thought that the auditory hallucinations may

represent his thoughts rather than perceptual disturbances. Mr. Monolo diagnosed

schizoaffective disorder-depressive type, alcohol dependence (in partial remission per

client), cannabis-related disorder (in partial remission per client), and a Global

Assessment of Functioning ("GAF") score of 50[1] (current with medication). He opined

that Plaintiff was capable of understanding, remembering, and following simple

instructions and had intact concentration and persistence during the examination. He also

---

[1]    A GAF score represents a clinician's judgment of an individual's overall
ability to function in social, school, or occupational settings, not including impairments
due to physical or environmental limitations. Diagnostic & Statistical Manual of Mental
Disorders (4th ed.) (DSM-IV) at 32. GAF scores of 31-40 indicate "[s]ome impairment
in reality testing or communication or "major" impairment in social, occupational, or
school functioning; scores of 41-50 reflect "serious" impairment in these functional areas;
scores of 51-60 indicate "moderate" impairment; scores of 61-70 indicate "mild"
impairment.

opined that Plaintiff's mood and functioning could improve with consistent psychiatric treatment and medication compliance.  (Tr. 218-21.)

On February 4, 2008, John Rabun, M.D., saw Plaintiff for a consultative psychiatric evaluation in connection with Plaintiff's current applications for disability benefits.  According to Dr. Rabun, Plaintiff "appeared to be in significant psychological distress, though he minimized his problems."  Plaintiff reported that he had battled depression for ten or more years.  He did not like to leave his home, was withdrawn from family and friends and had no desire to do anything.  Dr. Rabun observed that Plaintiff had poor eye contact, reduced psychomotor activity, a low tone of voice, and decreased spontaneity.  Plaintiff was not under a psychiatrist's care at the time and was not taking any medication, reportedly due to insurance problems.  He told Dr. Rabun that he last used alcohol or illicit drugs "a few years ago."

On mental status examination, Plaintiff had difficulty concentrating and focusing.  Dr. Rabun believed that Plaintiff's content of thought revealed symptoms of major depression, and that Plaintiff would lack the capacity to focus, concentrate, remember instructions, interact appropriately in a social setting, or adapt to changes in a work environment, though he did have the capacity to manage his own funds.  Dr. Rabun diagnosed major recurrent depressive disorder, severe, with mood-congruent psychotic features, and a current GAF of 40.  (Tr. 222-24.)

Also on February 4, 2008, Plaintiff was seen for a consultative evaluation by internist Raymond Leung, M.D., who noted that Plaintiff had hypertension, a history of

closed-head injury with subsequent seizures, and left knee pain.  On musculoskeletal examination, Dr. Leung found Plaintiff's gait "was significant for a slight limp." Plaintiff, while able to walk 50 feet unassisted, was not able to heel walk, was not able to toe walk, was only able to squat halfway down, and was not able to hop on his left leg. The left knee was found to be enlarged, swollen, and slightly warm, with decreased range of motion.  (Tr. 225-30.)

A Mental RFC assessment and a Psychiatric Review Technique form was completed by state agency employee Aine Kresheck on March 10, 2008.  Plaintiff was assessed as having moderate limitations in the ability to understand and remember detailed instructions; carry out detailed instructions; maintain attention and concentration for extended periods, in coordination with or proximity to others without being distracted by them; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and respond appropriately to changes in the work setting.   Kresheck indicated that Plaintiff was capable of understanding and completing at least one-to-two step instructions, that limited social contact in the job setting might decrease job stress, and that Plaintiff's functioning was "likely to further improve if he would abstain from substance use and take medications as prescribed."  (Tr. 231-23.)

On the Psychiatric Review Technique form, Kresheck opined that Plaintiff would have moderate limitations in maintaining social functioning and in maintaining concentration, persistence, or pace.  Kresheck noted Plaintiff had an educational diagnosis of learning disorder and behavior disorder with a Weschler Adult Intelligence

Scale ("WAIS") of 78, 89 and 81.  (Tr. 244).[2]

Plaintiff was jailed from September 22 to 27, 2008, for failing to pay child support.  At his medical intake assessment, he denied current illness, reported that he did not have any physical limitations, did not require special care for a physical condition, and was not taking any medications.  He reported that he last used heroin over six months ago, but drank seven to eight 24 oz. beers daily and got "the shakes" most mornings until he had some alcohol.  The intake nurse observed that Plaintiff was fully alert, but appeared disheveled.  (Tr. 271-72.)  On September 25, 2008, Alan Felthous, M.D., examined Plaintiff after Plaintiff threatened to harm himself in apparent frustration with being unable to communicate with the public defender or pay his bond.  Plaintiff said he could start a job next Monday if they would release him from jail.  He stated he drank 6 beers a day.  Dr. Felthous noted Plaintiff reported a history of a variety of disorders, but Dr. Felthous stated that he could not make a diagnosis and indicated that Plaintiff should be placed on high-risk status due to his threats to harm himself.  (Tr. 262.)

Six months later, on March 25, 2009, Plaintiff went to a medical center with complaints of dizziness for one week and to refill medications (Seroquel and Depakote) which he was currently not taking.  He was currently taking no medications.  He claimed "moderate" alcohol use and no drug use.  On examination, Christine Jones, M.D., found

---

[2]     WAIS-III classifies IQ scores within the 70-79 as borderline; within the 80-89 range as low average; and scores within the 90-109 range as average.

normal attention span and ability to concentrate, appropriate fund of knowledge, full range of motion in all joints, and normal muscles and gait. She prescribed Seroquel for bipolar disorder and Dilantin for seizures. (Tr. 251-52.) On the same day, upon referral by Dr. Jones, Plaintiff was seen by a licensed clinical social worker for his depression. It was noted that he was restless throughout the interview and moderately depressed. (Tr. 250.)

On June 3, 2009, Plaintiff returned to Dr. Jones for medication refills and with complaints of pain in his left knee. Results of a mental and physical examination were identical to the findings on March 25, 2009. Dr. Jones advised Plaintiff to return in four months if his knee continued to hurt. (Tr. 307-08).

A psychiatric evaluation was performed on June 12, 2009, upon referral by Dr. Jones. The evaluator noted that Plaintiff had last lived independently in 2007 and that Plaintiff reported currently feeling "down, sad" and ambivalent about living. Plaintiff was started on Prozac again and his Seroquel was increased. It was suggested that electro convulsive treatment ("ECT") might be appropriate. The diagnosis was possible schizophrenia, possible pervasive developmental disorder, major depressive disorder with psychosis, and schizoaffective disorder. (Tr. 314-18.)

On June 18, 2009, Plaintiff saw William Feldner, M.D., upon referral from Dr. Jones for moderate left knee pain. Dr. Feldner performed a mental examination which was normal, including normal attention span, ability to concentrate, and fund of knowledge. He observed swelling and a decreased range of motion in the left knee,

ordered x-rays, and advised that review of the x-rays was necessary before he could make recommendations. (Tr. 312-13).

The most recent evidence in the medical record is a report by psychiatrist Richard Kratia, M.D., whom Plaintiff saw for follow up on July 27, 2009, after not showing up for an appointment on June 26, 2009. (Tr. 319.) Plaintiff reported that he slept a lot especially during the day, that his mood was "shifty," and recently "low" with some vague suicidal ideation. He felt that his medications were helping him. He last heard voices about a week earlier but could not make out what they were saying. He also reported that he worked at temporary jobs "at times." Dr. Kratia indicated that Plaintiff had not improved or worsened. He indicated, in check-box format, that Plaintiff had good eye contact and was cooperative and focused, and that his mood was euthymic (non-depressed), but his affect flat. He wrote that Plaintiff had schizophrenia -- "stable & doing fair" -- and depressive symptoms. He increased Plaintiff's Prozac, continued him on Seroquel, and scheduled a follow-up visit in one month. (Tr. 320.)

**Evidentiary Hearing of August 19, 2009** (Tr. 23-42)

Plaintiff testified that he had just turned 40 years old, had a 12th grade education, and lived with his mother and step-father in their house. He reviewed his work history and stated that he could not currently work due to his seizures and distractions and attention span problems. Plaintiff testified that he had had a few seizures since 2006 but did not go to the hospital for them. He no longer drank more than one beer a month and last smoked marijuana in January 2009.

9

When asked about his daily activities, Plaintiff testified that he mostly just hung around the house. He did some work for friends, like mowing grass, in exchange for money he needed to pay child support. He was currently taking Seroquel and Prozac, but admitted that he had not always been consistent in taking his medications. Plaintiff testified that he got the car detailing job because the person who hired him was a friend of Plaintiff's brother, but then Plaintiff was asked to leave because he was "having seizures" and "got worse and worse" due to his medications.

Plaintiff also testified about his physical condition, saying that he could walk for about 15 minutes and stand for about ten minutes, and that he had some back pain. He testified that he had trouble following instructions on a job -- he would be listening and his mind would go blank. Plaintiff described his current understanding of what the ALJ was saying similarly. He stated that the Seroquel made him tired and all he wanted to do was sleep.

After the VE questioned Plaintiff about his tasks at his past jobs, the ALJ asked the VE to consider an individual of Plaintiff's age, education, and past work experience who could perform work at the medium exertional level; could frequently but not constantly climb stairs, ramps, ladders, ropes, and scaffolds; needed to avoid constant exposure to unprotected heights and hazardous machinery; and was limited to unskilled work that required no more than occasional contact with the public or coworkers. The VE testified that such an individual could not perform Plaintiff's past work, but could perform the jobs of cleaner, packer, and bagger, jobs which all existed in significant numbers in the

local and national economy. If the same individual were limited to light work, there would still be jobs he could perform, such as bench assembler of small items, racker, and bagger of garments, but if the individual needed to lie down during the day for "extended periods of time," and was unable to focus on the job for extended periods of time, there would be no jobs he could perform.

**ALJ's Decision of September 22, 2009** (Tr. 9-19)

The ALJ found that Plaintiff had the severe impairments of history of seizure disorder; polysubstance abuse; and schizoaffective disorder, but that these impairments, singly or in combination, did not meet or medically equal the severity of a deemed-disabling impairment listed in the Commissioner's regulations. The ALJ found that Plaintiff had the RFC to perform medium work, but needed to avoid concentrated exposure to industrial hazards and unprotected heights due to his seizure disorder; could perform work requiring frequent but not constant use of ramps, stairs, ropes, ladders and/or scaffolds; and was limited to simple tasks that would require no more than occasional contact with the general public and co-workers.

After summarizing Plaintiff's testimony at the hearing and the medical record, the ALJ found that Plaintiff's statements about the intensity, persistence, and limiting effects of his alleged symptoms were "not entirely credible." The ALJ found that there was no evidence that Plaintiff's seizure disorder would limit him beyond the restrictions in the above RFC. The ALJ also determined that Plaintiff did not have a medically determinable impairment associated with his left knee. The ALJ noted that a specific

knee impairment had never been diagnosed, that Plaintiff did not claim a knee problem in his applications for benefits, and that in March 2009 he was described as having a normal gait and a full range of motion of all joints.

Turning to Plaintiff's mental impairments, the ALJ stated that Plaintiff had been diagnosed with schizoaffective disorder, but, according to the ALJ, had not received treatment for this until "very recently" and that based on Dr. Kratia's July 29, 2009 evaluation, it appeared that treatment worked well when Plaintiff was compliant. The ALJ commented that although Plaintiff reported to Dr. Rabun in February 4, 2008, that he had battled depression for at least the past ten years, Plaintiff had worked in all years through 2006, despite his symptoms and there was no evidence that they had worsened since then.

Plaintiff's allegations of abstinence from drugs and alcohol were given no credibility by the ALJ because at other times Plaintiff acknowledged continued polysubstance abuse, making it clear that he did not follow medical advice to abstain. The ALJ commented that "[o]ne would expect any continued abuse to exacerbate symptoms."

The ALJ stated that Plaintiff's daily activities also provided evidence that he was capable of performing sustained work activity. The ALJ pointed to Plaintiff's hearing testimony that he mowed grass to make child support payments, Plaintiff's reporting to Mr. Monolo that he worked at a bar in exchange for drinks and visited friends daily, and the July 29, 2009 notation by Dr. Kratia that Plaintiff worked at temporary jobs at times.

The ALJ noted Plaintiff's "relatively low and somewhat sporadic earnings," such that annual disability benefits would approximate annual earnings he was able to achieve by working, adding a "motivation to over-report symptoms."

The ALJ pointed to Mr. Monolo's statement that the absence of medication for the past month might account for Plaintiff's symptoms, especially his auditory hallucinations, and that Plaintiff's failure to seek treatment during the year between Mr. Monolo's and Dr. Rabun's evaluations was a basis for discounting Plaintiff's complaints.

The ALJ explained that he gave Dr. Rabun's February 4, 2008 assessment "little weight" in determining Plaintiff's RFC because from Plaintiff's contradictory statements to other medical sources, it appeared that Dr. Rabun's opinions were based on Plaintiff's own exaggerated report of Plaintiff's symptoms rather than on objective evidence.

The ALJ found that Plaintiff could not perform his past work as a dishwasher/prep cook or car detailer, but could perform the representative jobs identified by the VE of cleaner, packer, and bagger. As these jobs existed in significant numbers in the local and national economy, Plaintiff was not disabled under the Social Security Act.

## DISCUSSION

## Standard of Review and Statutory Framework

In reviewing the denial of Social Security disability benefits, a court must affirm the Commissioner's decision "so long as it conforms to the law and is supported by substantial evidence on the record as a whole." *Reed v. Barnhart*, 399 F.3d 917, 920 (8th Cir. 2005) (citation omitted). This "entails 'a more scrutinizing analysis'" than the

substantial evidence standard. *Id.* (quoting *Wilson v. Sullivan*, 886 F.2d 172, 175 (8th Cir. 1989)). The court's review "'is more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision'"; the court must "'also take into account whatever in the record fairly detracts from that decision.'" *Id.* (quoting *Haley v. Massanari*, 258 F.3d 742, 747 (8th Cir. 2001) (citation omitted)). Reversal is not warranted, however, "'merely because substantial evidence would have supported an opposite decision.'" *Id.* (quoting *Shannon v. Chater*, 54 F.3d 484, 486 (8th Cir. 1995) (citation omitted)). A court should "disturb the ALJ's decision only if it falls outside the available "zone of choice." *Hacker v. Barnhart*, 459 F.3d 934, 936 (8th Cir. 2006) (citations omitted).

To be entitled to benefits, a claimant must demonstrate an inability to engage in any substantial gainful activity which exists in the national economy, by reason of a medically determinable impairment which has lasted or can be expected to last for not less than 12 months. 42 U.S.C. § 423(d)(1)(A); *Barnhart v. Walton*, 535 U.S. 212, 217-22 (2002). The Commissioner has promulgated regulations, found at 20 C.F.R. § 404.1520, establishing a five-step sequential evaluation process to determine disability. The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity. If so, benefits are denied. If not, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments. A severe impairment is one which significantly limits a person's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1521(a).

If the claimant does not have a severe impairment that meets the duration requirement, the claim is denied. Otherwise, the Commissioner determines at step three whether the claimant's impairment meets or is equal to one of the deemed-disabling impairments listed in the Commissioner's regulations. If not, the Commissioner asks at step four whether the claimant has the RFC to perform his past relevant work. If so, the claimant is not disabled. If he cannot perform his past relevant work, the burden of proof shifts at step five to the Commissioner to demonstrate that the claimant retains the RFC to perform work that is available in the national economy and that is consistent with the claimant's vocational factors -- age, education, and work experience.

**ALJ's Assessment of Plaintiff's RFC**

Plaintiff argues that the ALJ's decision must be reversed because the ALJ's assessment of Plaintiff's mental RFC is not supported by any medical evidence. In fact, argues Plaintiff, the record establishes mental limitations far more substantial than recognized by the ALJ. The Court agrees.

A disability claimant's RFC is the most he or she can still do despite his or her limitations. 20 C.F.R. § 404.1545(a)(1). In *McCoy v. Schweiker*, 683 F.2d 1138 (8th Cir. 1982) (en banc), the Eighth Circuit defined RFC as the ability to do the requisite work-related acts "day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." *Id.* at 1147. The ALJ's determination of an individual's RFC should be "based on all the evidence in the record, including the medical records, observations of treating physicians and others, and an individual's own

description of his limitations." *Krogmeier v. Barnhart*, 294 F.3d 1019, 1024 (8th Cir. 2002) (citation omitted).

A claimant's RFC is essentially a medical question, and some medical evidence must support the ALJ's RFC determination. *Id.* at 1023; *Hutsell v. Massanari*, 259 F.3d 707, 711-12 (8th Cir. 2001); *Carey v. Astrue*, No. 4:11CV212 FRB, 2012 WL 1033341, at *29 (E.D. Mo. March 27, 2012). "In cases involving mental impairments, recognition must be given to the instability of such conditions and their waxing and waning nature after manifestation." *Carey*, 2012 WL 1033341, at *22.

Here, the ALJ discounted Dr. Rabun's opinions on the ground that they were based on Plaintiff's own exaggerated report of Plaintiff's symptoms rather than on objective evidence. The Court questions this finding. As described above, Dr. Rabun observed that Plaintiff "appeared to be in significant psychological distress, though he minimized his problems," and that Plaintiff had poor eye contact, reduced psychomotor activity, a low tone of voice, and decreased spontaneity. These are not opinions based on Plaintiff's report of his symptoms. To conclude otherwise would be to question Dr. Rabun's judgment as a psychiatrist, something neither the ALJ nor this Court is qualified to do on the basis of this record.

The ALJ based his decision with respect to Plaintiff's mental impairments in large part on Plaintiff's failure to seek medical treatment for these problems for up to one year at a time, Plaintiff's failure to take his medications on a consistent basis, and the conclusion that Plaintiff's mental impairments would be responsive to treatment if

Plaintiff were compliant with his medication regimen. The first two factors above are supported by the record, and are indeed valid factors for the ALJ to have considered. *See, e.g., Roth v. Shalala*, 45 F.3d 279, 282 (8th Cir. 1995) (explaining that failure to follow prescribed course of remedial treatment, without good reason, is grounds for denying disability benefits). Here, however, the ALJ failed to consider whether Plaintiff's noncompliance was due to his mental impairments, rather than willful conduct. *See Pate-Fires v. Astrue,* 564 F.3d 935, 946 (8th Cir. 2009) (stating that in order for an ALJ to rely on noncompliance in a mental-impairment case, the ALJ must determine whether failure to follow prescribed treatment was a manifestation of that claimant's mental disorder).

Furthermore, the third and crucial factor above relied upon by the ALJ is problematic. The ALJ based his conclusion that Plaintiff's mental condition was treatable with compliance on Dr. Kratia's July 29, 2009 evaluation. The Court's reading of this evaluation suggests that such reliance was not warranted. Mr. Monolo did suggest that Plaintiff's failure to take his prescribed medication for the prior month might account for his symptoms, but there is really no evidence to support this, and the ALJ did not base his decision on this suggestion.

The ALJ also found that Plaintiff's daily activities demonstrated a functional ability to engage in sustained work activity. The "ability to perform such routine and simple daily living activities," however, "hardly seems inconsistent" with Plaintiff's subjective complaints about symptoms relating to his mental functioning, i.e., inability to

focus and follow directions, depression, and auditory hallucinations. *See Reed v. Barnhart*, 399 F.3d 917, 922-23 (8th Cir. 2005); *Carey*, 2012 WL 1033341at *27.

As noted above, the ALJ also discredited Plaintiff's subjective complaints partly on the basis of Plaintiff's weak work record, finding that Plaintiff may be financially motivated to exaggerate his symptoms in an effort to obtain benefits given that receipt of such benefits would provide more annual income than he generally achieved through working. As noted by the Eighth Circuit, however, "all disability claimants are financially motivated to some extent." *Ramirez v. Barnhart*, 292 F.3d 576, 581-82 n.4 (8th Cir. 2002). As such, financial motivation should not be dispositive in assessing a claimant's credibility. *Id.* Instead, "a claimant's financial motivation may contribute to an adverse credibility determination when other factors cast doubt upon the claimant's credibility." *Id.*; *see also Carey*, 2012 WL 1033341, at *28 (holding that because other factors upon which the ALJ relied to cast doubt upon Plaintiff's credibility were not supported by the record, Plaintiff's possible financial motivation in seeking benefits could not serve as a basis upon which to discredit his subjective complaints).

The Court believes that the above problems with the ALJ's analysis warrant reversal and remand in this case. The Court agrees with the ALJ that Plaintiff has credibility issues due to his inconsistent statements regarding his use of illicit drugs and alcohol. "One strong indication of the credibility of an individual's statements is their consistency, both internally and with other information in the case record," including statements made by the claimant at each prior step of the administrative review process.

SSR 96–7p, 1996 WL 374186, at *5 (July 2, 1996).  Nevertheless, the ALJ is still required to perform a proper and complete analysis of the extensive evidence of Plaintiff's mental health impairments.

**CONCLUSION**

The ALJ's determination that Plaintiff was not disabled since April 24, 2007, is not supported by substantial evidence on the record as a whole.  Because the current record does not conclusively demonstrate that Plaintiff is entitled to benefits, it would be inappropriate for the Court to award Plaintiff such benefits at this time.  On remand, the ALJ should ensure that he considers and sufficiently discusses the medical evidence of Plaintiff's mental health treatment, including his low GAF score history, his IQ scores, the diagnoses, reports, and opinions of his treating mental health professionals, and his diagnosis which in school.  The ALJ should identify sufficient medical evidence to support his mental RFC assessment.  He should determine whether any noncompliance can be attributed to Plaintiff's mental impairments.  Further, he should ensure that he includes all credible impairments and limitations in the RFC assessment and in his hypothetical question to the VE.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **REVERSED** and **REMANDED**.

A separate Judgment shall accompany this Memorandum and Order.

_____
AUDREY G. FLEISSIG
UNITED STATES DISTRICT JUDGE

Dated this 7th day of June, 2012.